**UNITED STATES of America For the Use of HOWARD STEEL COMPANY, Plaintiff-Appellee,**

v.

**UNITED PACIFIC INSURANCE COMPANY, Defendant-Appellant.**

**A. M. TURNER COMPANY, an Illinois corporation, Plaintiff-Appellant,**

v.

**HOWARD STEEL COMPANY, a Missouri corporation, Defendant-Appellee.**

Nos. 17889, 17890.

United States Court of Appeals, Seventh Circuit.

June 2, 1970.

to make payments to Howard as provided for therein. Subsequently, Turner commenced a suit (case No. 216) against Howard for damages resulting from Howard's alleged breach of the said subcontract by stopping work on the project on May 22, 1967. In that suit Howard filed a counterclaim praying for judgment on account of lost profits and other damages, predicated upon its theory that Turner had breached the said subcontract.

The cases were consolidated for trial and tried before District Judge Robert D. Morgan, without a jury. In case No. 210, judgment was entered in favor of Howard against Pacific in the amount of $70,211.04, with interest in the amount of $5,526.02. In case No. 216, Turner's complaint against Howard was dismissed and judgment entered in favor of Howard on its counterclaim against Turner in the amount of $23,488.60, without interest. Pacific appeals from the judgment in case No. 210 (No. 17889), and Turner from that in case No. 216 (No. 17890).

Frank G. Schubert, Rock Island, Ill., Irvin B. Charne, Milwaukee, Wis., for appellants.

Robert A. Van Vooren, Thomas N. Kamp, William C. Davidson, Davenport, Iowa, Lane & Waterman, Davenport, Iowa, of counsel, for appellee.

Before MAJOR and HASTINGS, Senior Circuit Judges, and CUMMINGS, Circuit Judge.

MAJOR, Senior Circuit Judge.

This litigation had its genesis in a contract between A. M. Turner Company (Turner) and the United States of America, for the rehabilitation of a bridge structure in Rock Island, Illinois. Howard Steel Company (Howard) was a subcontractor of Turner in the prosecution of its contractual undertaking upon that project. United Pacific Insurance Company (Pacific) was Turner's surety. The United States, for the use of Howard, commenced a suit (case No. 210) against Pacific for money allegedly due to Howard under its subcontract with Turner. Howard alleged that Turner had breached that subcontract by its refusal

The issues for review, as stated in Turner's brief, are:

"1. Does the evidence offered at trial support the trial court's finding that Howard Steel Company left the job on May 22, 1967 because it had completed all its work which could then be done?

"2. Did Howard Steel Company breach its contract with Turner by its withdrawal from this job on May 22, 1967 and its failure to return to work?

"3. Was Turner obligated to make payment to Howard on or before May 31, 1967, of the 'undisputed' portion of the May 19, 1967 payment from the Government to Turner even though Howard had pulled off the job?

"4. Was Turner in default of any payment due to Howard Steel as of May 22, 1967, when Howard Steel abandoned the job?

"5. Does the quality of the evidence offered by Howard Steel Company in its Counterclaim for damages

in Cause No. 17890 support the award of damages on that claim?

"6. Should a new trial of this matter be granted in the interest of justice?"

It is at once evident that the first five issues merely question the sufficiency of the evidence to support the trial court's findings of fact. Issue 6 raises the question as to whether the trial court abused its discretion in denying a post-trial motion for a new trial. Turner in the concluding portion of its brief in support of its argument relative to issue 6 stated, "Prior to the commencement of trial, it was evident to all involved that the court's decision would be determined largely by the credibility of the witnesses."

The trial court rendered a memorandum opinion (not published) in which it discussed in detail the evidentiary situation developed by the parties. The opinion contains a recitation of the evidence, some of it of a controversial nature, upon which the court based its specific findings of fact.

A careful study of the record in connection with the trial court's opinion, including its findings of fact, leads to the conclusion that the same factual issues argued here were raised in the district court and decided adversely to Turner. We think this is a typical case for the application of Rule 52(a) of the Federal Rules of Civil Procedure.

Of the many cases which could be cited where this rule has been given effect, Pacific Queen Fisheries et al. v. Symes et al., 307 F.2d 700 (9th Cir.), is of particular relevancy because there, as here, the controversy involved the construction of a contract. The court stated (page 706):

"Secondly, it is not incumbent upon *appellees* to persuade this court that the district court's findings of fact are correct; on the contrary, the *appellants* must persuade this court that the district court's findings of fact are, as specified by appellants, clearly erroneous. Third, this court must view the evidence in the light most favorable to the party who prevailed below; such a party must be given the benefit of all inferences that may reasonably be drawn from the evidence. The findings of the trial court sitting without a jury must be accepted unless they are clearly erroneous; they cannot be upset if they are supported by substantial evidence."

The Supreme Court stated in Zenith Radio Corp. v. Hazeltine Research, Inc., et al., 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129:

"The question for the appellate court under Rule 52(a) is not whether it would have made the findings the trial court did, but whether 'on the entire evidence [it] is left with the definite and firm conviction that a mistake has been committed.'"

Closely akin to the rule which limits our scope of review is the well recognized principle that where issues are tried to the court, its function is to determine the issues and the credibility of the testimony. United States ex rel. Helwig v. Maroney, 271 F.2d 329 (3rd Cir.). If under the factual circumstances of the case the ultimate conclusion is one about which reasonable minds could differ, the issue is one for the trier of fact. Nelson v. Greene Line Steamers, 255 F.2d 31 (6th Cir.).

The trial court's opinion evidences that it was keenly aware of its obligation to weigh and judge of the credibility of the witnesses. The two principal witnesses were Alan Howard (president of Howard Steel Company) and John Bihlmire (president of A. M. Turner Company). The court thoroughly analyzed their testimony, as well as documentary and other evidence, and concluded:

"Voluminous documentary and testimonial evidence bears upon the issue as to breach of contract. Upon this aspect of the case, the principal witness for Howard is its president, Mr. Howard. The principal witness for Turner is its president, Mr. Bihlmire.

"The testimony of those two witnesses directly contradicts the testi-

mony of each the other in many critical areas. Thus, the court is faced at the outset with the task of weighing the credibility of such witnesses.

"Each of those principal witnesses spent many hours upon the witness stand during the course of direct and cross-examination. It would, therefore, be strange indeed if there were not apparent contradictions in the testimony of each of them. It would be strange if each of them was not contradicted in some measure by the content of the voluminous paper exhibits introduced in evidence. Such contradictions do exist with reference to the testimony of both Mr. Howard and Mr. Bihlmire.

"As between those two witnesses, the testimony of Mr. Howard is patently more probable than that of Mr. Bihlmire, and, also, substantially corroborated by the testimony of other witnesses and by the exhibit evidence in all material respects. Conversely, the testimony of Mr. Bihlmire is contradicted in many material respects by inconsistent statements made by him on cross-examination, by the exhibit evidence, and by the testimony of other witnesses. Among such witnesses are Turner's job superintendent and officials and agents of C of E [Corps of Engineers].

"This court does not attempt herein to itemize such contradictions in either complete depth or detail. This discussion is limited to exemplary areas of impeachment of the Bihlmire testimony upon crucial factual aspects of the case."

In view of the thorough consideration given by the district court, no useful purpose could be served by a detailed statement of the controversial facts. Turner obtained a contract, dated June 30, 1966, with the U. S. Corps of Engineers to rehabilitate and alter a bridge at Rock Island, Illinois, which was the standard form of contract employed by the Corps of Engineers for work of this type. As described in the trial court's decision, the bridge to be rehabilitated

under the contract consisted of eleven spans which were designated numerically as spans 1 through 11, respectively. Span 11 which ran over some railroad tracks was different in design and structure from spans 1 through 10. The work was initially commenced on span 10 and proceeded toward span 1. Span 11 was left as the final portion of the work to be completed.

On September 1, 1966, Howard entered into a subcontract with Turner to undertake certain work covered by Turner's contract with the Corps of Engineers. After Howard had commenced performance, a written supplement, the requirements of which were much in dispute, was added to the subcontract.

■ Howard performed under its contractual obligation and, by May 22, 1967, had completed substantially all of the work required of it on spans 1 through 10, and was ready to begin on span 11. On that date, however, Howard discontinued its work. Whether this action on the part of Howard constituted a breach of the contract presents one of the primary issues of the case.

Turner contends that it does, while Howard contends that its discontinuance was justified for numerous reasons, (1) that there was no work on span 11 which it was required to do until certain preliminary work had been performed by Turner; (2) that Turner had not submitted to and obtained the approval of the Corps of Engineers of its proposed method of operation, as it was required to do under the contract, and (3) that Turner had refused to make payments to Howard in accordance with the terms of the contract.

With reference to Howard's discontinuance of work on May 22, 1967, the court found:

"7. Howard's termination of work on May 22, 1967, was made necessary by the fact that it had then completed all of its work on the project which could reasonably then be done.

\*   \*   \*   \*   \*   \*

"14. As of May 22, 1967, Howard had completed all extra work, undertaken by it under its supplement to the contract, had substantially completed all work undertaken under its original contract related to spans 1 to 10, inclusive, and had removed about 90% of the brick decking from span 11. Howard completed its contract obligations related to spans 1 to 10 by additional work done by it on June 19 and 20, 1967. When Howard left the job site on May 22, 1967, it had progressed as far as was then possible in the performance of its contract, pending C of E approval of Turner's proposed procedures for completing the span 11 phase of the project.

"15. Howard's termination of work on May 22, 1967 was done by and with the approval of both Turner and C of E, and Howard was not then guilty of any breach of its contract with Turner."

Turner in its argument on brief here clearly reveals the tenuous nature of its contention on the issue of the effect to be given Howard's cessation of work. It states, " * * * when the President of Howard Steel and its job Superintendent testified, they both stated flatly that on May 22, 1967 there was no more work for them to do." After this admission, Turner devotes a good part of its brief to quoting from the cross-examination of Howard's president and the testimony of its job superintendent and Turner's president. Obviously, this was done in an effort to demonstrate that the testimony of Howard's president and its job superintendent was unworthy of belief. The presentation thus made calls upon this court to weigh the testimony and judge the credibility of the witnesses which, as already noted, is the function of the district court.

The district court, referring to the testimony of Turner's president, stated:

"Mr. Bihlmire's testimony that there was work under Howard's contract on span 11 which could have been done as of May 22, 1967, is contradicted by the proposed sequence of operations to be employed in the renovation of that span which Turner had prepared and submitted to C of E for approval. His further testimony that C of E approval was not necessary for the commencement of work on span 11 is refuted by a series of letters from Turner to C of E requesting C of E approval in order that its work on span 11 might be commenced. Written C of E approval for that phase of the project was actually obtained by Turner on May 29, 1967.

"The above areas of impeachment of Mr. Bihlmire's testimony are recited simply as indicative of the serious question as to his credibility as a witness to factual matters bearing upon the ultimate issues in litigation.

"Since it is the duty of the court to make a choice between diametrically opposed testimony, for the reasons hereinabove stated, credence is given to the testimony of Mr. Howard as to the events leading up to the stalemate and subsequent litigation. Credence is denied to the testimony of Mr. Bihlmire in those crucial evidentiary areas."

Turner strongly insists there is no evidence to support the court's finding (above quoted) that Howard's termination of work on May 22, 1967 was done with the approval of both Turner and the Corps of Engineers. While there was no proof of express consent so far as we can determine, we think from the circumstances the court could reasonably infer that such was the case. Certainly neither Turner nor the Corps of Engineers did anything to indicate that they at that time regarded it as a breach of contract. No demand was made by Turner for Howard to return to the contract until July 18, 1967, almost two months after Howard left the job. At the time Howard terminated its work, it left on the premises some of the equipment which it had leased to Turner. It seems evident, at any rate plainly inferable, that all of the parties recognized that Howard's cessation of work on May 22, 1967 was not a breach of contract but

resulted from Turner's failure to comply with its terms.

In any event, whether the proof supports the finding that Howard's action was with the approval of Turner and the Corps of Engineers is not critical. Whether it was with their consent or not, the question remains as to whether Howard's discontinuance of work was for the reasons assigned by it or a breach of contract. We agree with the reasoning and conclusion of the district court that Howard's conduct did not constitute a breach of contract.

■ This brings us to events which took place subsequent to May 22, 1967. The record is clear that Howard was willing to return to the job if Turner would make payments in amounts which were undisputed and as provided for in the subcontract. Turner's first communication to Howard, dated July 18, 1967, demanded that Howard return to the work. On August 16, 1967, Howard advised Turner that it had suspended its work under the subcontract because of the latter's failure to make the required progress payments, but that it was ready to resume when Turner's default was cured. On August 24, 1967, Turner terminated the subcontract.

Turner's obligation to make payments to Howard and the time thereof are found in paragraph 8 of the subcontract as follows:

"That we shall make payments to you once each month, provided payment for such work and materials has been received by us from the Owner, in the amount of 100 percent of the estimate submitted by you, and accepted by us, for work performed in the previous month, provided necessary waivers of mechanics' and other liens are legally executed, delivered to and accepted by us at the time of such payment. Such estimates to be submitted by you not later than the 25th of each month. Final payment to be made to you thirty days after completion and acceptance of your work, and of payment therefor to us by the Owner".

Stripped of nonessential matters, the pertinent provision of this contract required that Turner make payments to Howard once each month, provided payment had been received by Turner from the Corps of Engineers for work performed in the previous month.

The district court found that on May 19, 1967, Turner received a payment from the United States for all labor and material invoiced by Howard for the month of April; that of the aggregate payment received by Turner, the amount of $28,015.12 was for undisputed items of performance under the subcontract, which Turner was obligated to pay Howard on or before May 31, 1967, and that its refusal to do so was a material breach by Turner of its contract with Howard.

The court found that on June 20, 1967, Turner received payment from the United States for labor and material invoiced by Howard for the month of May, for an amount which included undisputed items in the amount of $23,047.58, which it was obligated to pay Howard on or before June 30, 1967, but that it refused to make such payment, which was an additional material breach by Turner under the subcontract.

The court further found that on September 15, 1967, Turner received payment from the United States for material delivered to it by Howard in August 1967, in an undisputed amount of $2,-614.09, which Turner was obligated to pay Howard on or before September 30, 1967, which it refused to do.

Turner attempts to escape the findings of the court as to the time and amount of payments which it was obligated to pay Howard by arguing that the court misinterpreted the provisions of paragraph 8, above quoted. It is our view that the terms of the paragraph are plain and not susceptible of interpretation. Turner's principal argument on this point, however, is predicated upon the premise that Howard breached the contract on May 22, 1967, when it temporarily suspended performance and, as a consequence, Turner was relieved of the obligation to make payments after

that date. Numerous Illinois cases are cited in support of this contention which no doubt state the law, given the premise relied upon by Turner. However, the court found and we have held that there was no breach by Howard on May 22, 1967. Such being the case, Turner's argument in this respect must fail and there is no occasion to cite or quote from the Illinois cases relied upon.

■ Turner complains that the quality of the proof was not sufficient to support the judgment in favor of Howard on its cross-complaint for damages sustained as a result of a breach of the contract by Turner. Such damages in the main consisted of lost profits. Alan Howard, president of Howard, was the main witness relied upon by the court in determining the amount of damages awarded.

Turner argues that the testimony of Howard is not sufficient to maintain the burden of proof for a party seeking loss of profits and that his testimony is pure speculation. We need not relate the numerous capacities in which Howard had been engaged in the steel business over a period of thirty years. He negotiated the subcontract with Turner and was familiar with its specifications and conditions. We think he can be properly characterized as a highly qualified witness. Moreover, his testimony was admitted without objection.

Turner cites Salaban v. East St. Louis and Interurban Water Co., 284 Ill.App. 358, 362, 1 N.E.2d 731, 733, for the statement, "An estimate of profits by an interested witness does not constitute such evidence as will support a judgment for damages." That case is distinguishable on its facts. In a much later case, Meyer v. Buckman, 7 Ill.App. 2d 385, page 404, 129 N.E.2d 603, page 613, on facts more similar to those here, the court stated:

"Where the president of a plaintiff corporation, who has knowledge of the facts, testifies that its costs were so many dollars and its profit was so many dollars per unit, which testi-mony stands alone and undisputed, the defendant presenting no evidence that the costs and profit contended for by the plaintiff were not correct or unfair or unreasonable, that is sufficient to sustain a recovery by the plaintiff for such loss of profits; the burden of proving the damages were not correct or unfair was on the defendant who had breached the contract."

In the same case (page 406, 129 N.E.2d page 614), the court made the pertinent observation:

" * * * the plaintiff, though an interested witness, was an entirely competent witness,—and the determination of the credibility of the witnesses and weight of the evidence was for the Trial Court,—his testimony is corroborated, if that were necessary, by his statement as to the particular breakdown of costs and by the circumstances * * *."

Moore v. Schoen, 313 Ill.App. 367, page 372, 40 N.E.2d 562, page 564, distinguished the *Salaban* case and held:

"A recovery may be had for prospective profits, when there are any criteria by which probable profits can be estimated with reasonable certainty. [Citing cases.]"

The court found, "A preponderance of the evidence supports Howard's counterclaim * * * for * * * Lost profits * * *, and other small amounts about which no question is raised." We discern no reason to reject this finding.

■ Lastly, Turner contends that in the interest of justice it should be awarded a new trial. This contention is based in the main on the showing that some sixty days prior to the date the trial was scheduled to commence, Turner discharged the attorney who had represented it for some ten or twelve months, and two weeks before the trial commenced employed the attorney who represented it there. It is contended that this recently acquired attorney was not given time to properly acquaint himself with the case and for that reason was handicapped in cross-examination of

the witnesses. There was no showing as to the reason why Turner discharged its first attorney or why, after having done so sixty days before commencement of the trial, it waited until two weeks before trial to employ another.

Turner cites no cases in support of its contention on this point. There are many cases, however, which hold that an application for a continuance is addressed to the sound judicial discretion of the trial court and that its denial furnishes no basis for reversal unless such discretion has been abused. Of the many cases which have considered the issue, see Baltimore American Ins. Co. of New York v. Pecos Mercantile Co., 122 F.2d 143, 145 (10th Cir.); McDonnell v. Tabah et al., 297 F.2d 731, 733 (2d Cir.); Grunewald v. Missouri Pacific Railroad Co., 331 F.2d 983, 987 (8th Cir.); and the decision of this court in Butterman v. Walston & Co., Inc. et al., 387 F.2d 822, 824.

Turner's contention that the court abused its discretion in denying its request for continuance and for a new trial is rejected.

We find no reversible error in this case, and the judgments appealed from are

Affirmed.